## Gorson's Case.

*Henry S. Drinker, Jr.*, for Board of Censors.
*Daniel G. Murphy*, for respondent.

STERN, P. J., Jan. 29, 1929.—The petition of the Committee of Censors, upon which a rule was granted on the respondent to show cause why he should not be disciplined, sets forth alleged improper professional conduct on the part of the respondent in five cases in which he represented the respective plaintiffs.

In these cases, the court, upon consideration of the testimony taken at the hearing before the court and also that taken before the Committee of Censors, finds the facts to be as follows:

1. The case of Herbert A. and Emma M. Hillgrove.

These parties were plaintiffs in a suit against the Yellow Cab Company, the wife plaintiff having sustained an accident on July 16, 1923. A verdict was obtained on June 11, 1924. An employee of the respondent reported to clients that a new trial had been granted, or at least asked for by the defendant, and suggested that a settlement was desirable. The plaintiffs finally agreed to settle for $600, and a month later received from the respondent a check for $300, representing their half of the alleged recovery. As a matter of fact, the respondent, on Sept. 22, 1924, received a check from the defendant of $1592.96, the check being payable to his order as attorney and representing the verdict and costs. A year or more later, the plaintiffs learned that no new trial had been granted and that they had not received the proper amount due them. Complaint having been made to the Committee of Censors, the respondent paid an additional sum of $450 to the plaintiffs on Oct. 6, 1926.

The respondent's defense in this case was that the whole matter was transacted by one Smuckler, a former employee in his office, whose present whereabouts are stated to be unknown. The respondent stated that he had no files on the case, that he never kept any books except a check-book, and that the check-book for the period in question had been destroyed. His position was that he thought that Smuckler had paid clients what was due them out of cash in the office, although he admitted that he himself was the only person who could draw checks on his bank account. Incidentally, he admitted that he kept only one bank account, in which he mingled his own moneys with those obtained for clients. The respondent's testimony was extremely hazy and unconvincing, and the court finds the facts in this case as above stated.

2. The case of Albert and Rose Kravis.

These parties were plaintiffs in a suit against Armour & Company, the wife plaintiff having sustained injuries in an accident. A verdict of $1000

was obtained in December, 1926, and the respondent, as attorney for his clients, received a remittance from the defendant of $1040.80, under date of Jan. 20, 1927. He had an interview with his clients on or about Feb. 3, 1927, in which he stated that he had just received the check the day before, that it had not yet cleared, and that they should call the following Saturday. Upon their visiting him on the following Saturday, he proposed to settle with them by paying them $215, stating that there had been expenses of $285 (including doctor bills) payable out of their half share of the recovery. Upon their complaining of this settlement, he reduced the charges to $150, which was the amount stated to be necessary to pay the doctors. At first, the clients agreed to take the $350 thus offered, and the respondent tendered them three checks, one for $350, one for $100, and one for $50, asking them to endorse the two last named checks and to return them to him. The $100 check was supposed to be for the services of a Dr. Tunitzky, and the $50 check for the services of a Dr. Blumsweig. The respondent claimed that he had been subjected to a cost of $25 for investigating the jury, and to other expenses amounting to $10 or $15. As a matter of fact, Dr. Tunitsky had told the plaintiffs he would charge $50, and it was only at the respondent's suggestion that he increased his bill to $100. As to the charge of Dr. Blumsweig, he did not attend the plaintiffs and had nothing whatever to do with the case. The plaintiffs finally refused to accept the sum of $350 as their net recovery, and a violent and protracted dispute with the respondent followed. At a later period, a settlement was attempted with the plaintiffs through the instrumentality of Dr. Tunitzky of $500, which was refused, the plaintiffs demanding interest, and finally, on June 20, 1928, the respondent paid the plaintiffs $681 in full settlement of their claims.

In this case, also, the respondent was unable to produce any records or books, stating that he kept no books. The basic fact is that the respondent retained money belonging to his clients for a period of about seventeen months, which delay in payment was due to a dispute with his clients over the unjust charges which he attempted to assess against them. It is clear that the proposed payment of $100 to Dr. Tunitzky was excessive, that Dr. Blumsweig was not entitled to any payment, and it is further a fact, as the court finds, that the respondent had not spent any money for investigating the jury. Moreover, the respondent, by his own admission, had paid out no witness fees, but he received and retained money paid to him on that item by the defendant in the suit. There is considerable confusion in the evidence throughout as to the various items in controversy, but one cannot read the testimony without coming to the conclusion that the respondent wished to pay to his clients as little as possible, and that, in bargaining with them to that end, he set up various claims of expenses and outlays which were false and unjustified and upon which he himself did not ultimately insist.

3. The case of Eva M. Fox.

This party was a plaintiff in a suit against the City of Philadelphia to recover damages for an accident sustained by her in December, 1924. As a result of a verdict, the respondent received a mandamus upon the City in the sum of $1000 on Feb. 4, 1926. Subsequently the respondent told his client that he could settle the case with the City for $200, and she agreed that she would settle for that amount. A month later, he reported to her that he had received the $200, out of which she was to get $100, and he made her various small payments on account, some by check and some in cash. About two years later, the client accidentally learned that the respondent had in fact received $1000 from the City, and, after the Committee of Censors had taken

up the matter, the respondent, in May, 1928, paid to his client the additional sum of $400.

It thus appears that in this case the respondent misrepresented to his client the amount due to her, kept from her a substantial sum of money for a period of two years, and then made restitution only after investigation by the Committee of Censors had begun. The respondent's defense in this case was that he did not receive the cash on the mandamus until Feb. 23, 1927, that his client knew that he had the money, and that she had asked him to keep it for her. He frankly admits that when she demanded the balance due to her, he did not have it, that he had spent it, and that because of the fact that he had kept her money for so long a period he finally gave her the full half-part due to her without deduction of costs that she should otherwise have paid. The court finds as a fact that his client had no such understanding with him, as contended for by the respondent, and that his retention of the money was without her knowledge or consent. Moreover, his statement of his having spent the money is in itself a confession of a misuse of trust funds.

4. The case of Elizabeth Johnson.

This party had a suit against the Philadelphia Rapid Transit Company arising out of an accident sustained by her. The respondent on behalf of this claim recovered a verdict of $250, interest thereon of $8.54, and sundry items of costs, and was paid $279.34 by the defendant on June 17, 1926. He sent to his client two checks on July 20, 1926, one of $82.50 for herself, the other of $20 for her physician. The respondent attempts to explain this settlement by the statement that he had made various outlays of costs, and also expenditures of $25 for "jury service" and $25 for investigation of the case. The court finds as a fact that no such payments of $25 each were made by the respondent, that the charges were unjustified, and that, therefore, the respondent did not make an adequate accounting or settlement with his client in this case.

5. The case of Albert Traub.

This party had a suit against the Philadelphia Rapid Transit Company arising out of an accident in which he was injured on Feb. 14, 1924. A verdict was recovered of $1000, which was reduced by the court *in banc*, and the respondent received from the defendant the sum of $803.86, on or about July 29, 1925, in settlement of the case. The respondent, however, reported to his client that the case was being appealed and that he had settled it for $500. He paid to his client $250, less some deductions for witness fees. The respondent attempts to justify his settlement with his client by stating that he, the respondent, was to receive 50 per cent. of the gross recovery, or about $400, and that from the half share due the client he deducted $100 for the bill of the physician, witness fees amounting to $10 or $20, $5 for subpœnaing the records of the hospital, $6.50 for costs of suit and $25 for investigation of the case. The court finds as a fact that the $25 outlay for investigating the case was not in fact made. Moreover, the calculations of the respondent as testified to by him are not in accord with his version of the facts as set forth in his supplemental answer to the petition of the Committee of Censors.

It thus appears from the facts established by the five cases in question that the respondent kept no books and practically no records, that he maintained only a single bank account, in which he mingled his own moneys with those belonging to his clients, that at least in one instance he did not have money belonging to a client when demanded by her, that he attempted to make settlements with his clients by the payment to them of as little as possible, and in order to accomplish this purpose made claims of outlays and expenses

which in fact had not been incurred by him, that he misrepresented to clients the amounts obtained by him on their behalf, and unlawfully retained moneys due to them. On the whole, the court is compelled to conclude from the testimony that the respondent had no adequate conception of his duties to clients with reference to moneys collected for them, and apparently no realization of the fact that he was to all intents and purposes a trustee of such moneys, and as such bound to a complete and exact accounting.

It certainly is not necessary, nor would it serve any useful purpose, to write a disquisition on the standards and the traditions of the law as a profession, nor to reiterate the platitude that those who minister at her altar must be above reproach. The derelictions of the respondent in the present case were not violations of any abstruse or involved rules of ethics as to which opinions might differ, but were in disregard of the elementary principles of fair dealing. Under such circumstances, the court is obliged to enter the following order:

The rule of the Committee of Censors is made absolute, and the prothonotary is directed to strike from the roll of attorneys of the Courts of Common Pleas of Philadelphia County the name of Harry A. Gorson, the respondent, and to give notice of this action to the Orphans' Court of Philadelphia County and to the Supreme and Superior Courts of Pennsylvania.